# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-CA-00964-COA

| | |
|---|---|
| IN THE MATTER OF THE ESTATE OF GRACE J. HOWELL, DECEASED: STEVE LAMPTON | APPELLANT/CROSS-APPELLEE |

v.

| | |
|---|---|
| KEVIN HOWELL AS EXECUTOR OF THE ESTATE OF GRACE J. HOWELL | APPELLEE/CROSS-APPELLANT |

DATE OF JUDGMENT: 02/09/2024
TRIAL JUDGE: HON. J. LARRY BUFFINGTON
COURT FROM WHICH APPEALED: LAMAR COUNTY CHANCERY COURT
ATTORNEYS FOR APPELLANT: WILLIAM A. WHITEHEAD JR.
RICHARD D. NORTON
MADISON CHANDLER WRIGHT
ATTORNEY FOR APPELLEE: RICHARD ANTHONY FILCE
NATURE OF THE CASE: CIVIL - WILLS, TRUSTS, AND ESTATES
DISPOSITION: ON DIRECT APPEAL: AFFIRMED; ON CROSS-APPEAL: AFFIRMED - 07/21/2026

MOTION FOR REHEARING FILED:

## CONSOLIDATED WITH

## NO. 2024-CA-01046-COA

| | |
|---|---|
| KEVIN HOWELL, INDIVIDUALLY AND AS EXECUTOR OF THE ESTATE OF GRACE J. HOWELL AND TRENT HOWELL | APPELLANTS |

v.

| | |
|---|---|
| THE ESTATE OF TED LAVON HOWELL, DENICE STISHER HOWELL, STEVE LAMPTON, ANTHONY HUNT AND BRANDY HUNT | APPELLEES |

DATE OF JUDGMENT: 02/16/2024
TRIAL JUDGE: HON. J. LARRY BUFFINGTON
COURT FROM WHICH APPEALED: LAMAR COUNTY CHANCERY COURT

ATTORNEY FOR APPELLANTS:     RICHARD ANTHONY FILCE
ATTORNEYS FOR APPELLEES:     RICHARD D. NORTON
                             WILLIAM A. WHITEHEAD JR.
                             CHRISTOPHER D. MEYER

NATURE OF THE CASE:          CIVIL - WILLS, TRUSTS, AND ESTATE
DISPOSITION:                 AFFIRMED IN PART; REVERSED AND
                             RENDERED IN PART - 07/21/2026
MOTION FOR REHEARING FILED:

**BEFORE CARLTON, P.J., LAWRENCE AND McCARTY, JJ.**

**LAWRENCE, J., FOR THE COURT:**

¶1.     These appeals involve a will contest about property Grace Howell owned and devised in her will to be inherited by her son and two grandsons. After her death, her only son, Ted Howell, sold the property to Steve Lampton, who sold it for a profit to Brandy and Anthony Hunt. Ted kept the money for himself, and the grandsons, Kevin and Trent Howell, brought an action to set aside the deeds. In a separate action, Kevin admitted a copy of Grace's most recent will for probate. Lampton challenged the validity of the will in an attempt to maintain the validity of the property conveyances to him and then the Hunts. In the final judgment, the chancellor upheld the copy of Grace's will as valid and duly probated but found that the Hunts, who were dismissed as parties, had purchased the property in good faith. The chancellor therefore awarded the grandsons monetary damages. After careful review, this Court affirms the chancellor's ruling as to the validity of the will and the Hunts' involuntary dismissal but reverses and renders the chancellor's award of damages.

## FACTS AND PROCEDURAL HISTORY

¶2.     In 1977, Grace and Herbert Howell acquired family land in Lamar County from Hershel and Marie Howell. Herbert and Grace later sold approximately 20 acres of their

2

Lamar County property to her neighbor Steve Lampton. Herbert passed in the late 1990s, and the unsold portion remained Grace's property. Grace's property included two parcels—one parcel was unimproved, and Grace resided in a house on the second parcel. In July 1999, Grace granted Lampton a "Right of First Refusal and Option to Purchase."

¶3.     Grace's one son, Ted, and his wife, Glenna Howell, had two sons—Trent and Kevin. Ted and Glenna eventually divorced, and Ted remarried Denice Stisher Howell. Ted and Denice lived together in Huntsville, Alabama, until they were legally separated in 2012.

¶4.     In March 2007, Grace signed a Last Will and Testament, which stated, in part:

> I DEVISE TO MY Son, TED LAVON HOWELL, one-third, if he survives me; one-third to my Grandson, TRENT ALLEN HOWELL; and one-third to my Grandson, KEVIN LEE HOWELL all of my right, title and interest in and to the home and acreage located at 277 Richburg Road, Purvis, Mississippi or any other home in which I am residing at the time of my death. . . .

Grace appointed Ted as the executor, but in the event he could not serve, Kevin would be appointed. The will was witnessed by Lampton[1] and Glenna, Ted's first wife. The signatures on the will were notarized by Wayne Smith, the Lamar County Chancery Clerk. Grace's health subsequently deteriorated, and on February 28, 2008, she executed a power of attorney, appointing Ted as her "attorney-in-fact." Eventually, Ted moved Grace to Huntsville to live with him.[2]

¶5.     On June 30, 2010, Kevin bought from Grace, through Ted acting as Grace's power

---

[1] Lampton was the neighbor who previously purchased 20 acres from Grace and Herbert.

[2] There is conflicting evidence on when exactly Grace moved to Huntsville. Denice testified it was in November 2007 and Kevin testified it was in 2009. Regardless, there is no dispute that Grace lived in Huntsville by 2010.

of attorney, the parcel of land where Grace's house was located. Kevin also entered into a deed of trust with "Ted Lavon Howell, as attorney-in-fact of Grace Jane Jordan Howell" for the sum of $141,000 for the purchase of the house and second parcel of land. Grace died on June 14, 2012, and at the time of her death, she owned the remaining one parcel of land that was unimproved. After Grace's death, Kevin opened the house to family and friends to take any personal sentimental belongings that they desired.

¶6. Instead of probating Grace's will, Ted and Kevin contacted a Hattiesburg attorney who drafted a quitclaim deed that conveyed the property from Ted, Kevin, and Trent as grantors, to Ted, Kevin, and Trent as tenants in common. In creating the deed, Kevin, via email, requested Ted send a copy of Grace's will, and Ted sent the following email on December 7, 2015:

> Kevin,
> I located subject document. It was in a file in my desk drawer. Do you need a copy? If so, can I scan and email same to you? It was notarized by Rachel Sullivan, a branch manager of the Regions bank on Hwy 98. I hesitate to mail the original. Let me know what works for you.
> Dad

The email attachments were not produced. The quitclaim deed, which was dated December 20, 2016, was fully executed but never recorded in the county land records.

¶7. Ted's physical and financial well-being began to deteriorate, which resulted in Ted moving back into his marital home with Denice sometime in 2016. After the move, Ted appointed Denice as the primary beneficiary for his 401(k) retirement account, his will, and a "pay-on-death" bank account. Denice also was appointed Ted's power of attorney. Denice began managing Ted's finances and assisting him in handling his correspondence.

4

¶8. On September 27, 2017, Ted sold the unimproved parcel of land Grace owned to Lampton for $40,000. The warranty deed stated that Ted "is the sole legal and lawful heir" of Grace. Heirship affidavits from local pastors who knew Grace—Robert Holifield and Gregory Medenwald—were attached to the deed. The heirship affidavits did not mention that Grace had a will but stated that her only child was Ted. On November 14, 2017, just a few months after buying the property, Lampton sold the same parcel to his neighbors, the Hunts, for $65,000.[3] The heirship affidavits were redone by the same local pastors, but this time they swore that Grace did not have a will.

¶9. In January 2018, Kevin went to pay the property taxes for the two parcels of land and discovered that the taxes had already been paid.[4] That is when Kevin discovered his father, Ted, had sold the unimproved parcel. On March 2, 2018, Ted died.

*I. Commencement of Litigation*

¶10. On September 17, 2018, Kevin filed a "Petition to Probate Will in Common Form" in the Chancery Court of Lamar County ("the will case"). In his petition, Kevin requested authority to file a complaint on behalf of Grace's Estate to recover title to the property that was sold first to Lampton and then to the Hunts. Kevin attached a copy of the March 2007 will that was witnessed by Lampton and Glenna. An affidavit from Glenna, a subscribing witness, was also attached. Trent joined Kevin in the petition.

---

[3] The Hunts had acquired land in 2003 that neighbored Grace and Lampton's property.

[4] The two parcels included the one Kevin had bought from Grace before she died and the unimproved parcel, which he was supposed to inherit the one-third interest in according to Grace's will. The unimproved parcel is the subject of this litigation.

¶11.   On September 20, 2018, an "Order Admitting Will to Probate in Common Form" was entered.  It stated that Kevin had "set forth sufficient evidence that decedent did not destroy the original Will with the intent to revoke the same, nor did she execute any other subsequent Will."  It further granted Kevin leave to file a complaint to set aside the deeds.

¶12.   On the same day as the order admitting Grace's will to probate, Kevin, Trent, and the Estate of Grace (collectively referred to hereafter as "Kevin") filed a complaint in the Chancery Court of Lamar County against Lampton, Ted's Estate,[5] and the Hunts.  The complaint requested that the deeds to Lampton and the Hunts be canceled and monetary damages be awarded ("the property case").  Litigation proceeded on both cases separately; however, they were both assigned to Special Chancellor Larry Buffington.[6]

¶13.   On February 11, 2019, Lampton filed a "Notice of Claim" in the will case, arguing that "because of the delay between . . . Grace Howell's death in 2012 . . . and the time of the filing of opening of the Estate of Grace . . . the Petition to Probate the Estate of Grace J. Howell is improper."  It further stated that "[b]y copy of this Motion . . . Movant is notifying all parties that are involved in the property once owned by Grace Howell that this matter is hereby contested."

¶14.   On March 28, 2019, in the property case, Kevin moved to add Denice as a defendant.

---

[5] Ted's Estate was opened by Denice, Ted's second wife, in Alabama, but throughout the course of litigation here, the Alabama estate was closed.  The record evidences that, eventually, an ancillary estate in Mississippi was opened for the purposes of this litigation.

[6] Kevin filed motions for recusal in both the will and property cases arguing that the chancellors should recuse due to Lampton's service on the Lamar County Board of Supervisors.  All chancellors in the Tenth Chancery Court District recused, necessitating the appointment of a special chancellor.

6

Kevin alleged that Denice was married to Ted at the time of the execution of the deed to Lampton and had "negotiated the terms of the sale with Lampton and received and/or transmitted the required documents and payments." Kevin alleged that Denice committed fraud by knowingly denying Kevin and Trent their "rightful interests in the property" under Grace's will, threatening "to withhold care from Ted unless he kept all of the sale proceeds," and receiving the proceeds from the sale of the property. The chancellor granted Kevin's motion, and Denice was added as a party in the property case.

## II. Trial in the Property Case

¶15. On May 11-13, 2021, a bench trial was held in the property case.

¶16. Kevin testified first. He stated that he grew up spending time on his grandmother's property. As a young adult, Kevin lived with Grace on and off until 2006, when he was in a motorcycle accident that broke his lower back and caused a spinal cord injury. After the accident, Grace's home did not accommodate his wheelchair, so he moved into an apartment in Hattiesburg with Glenna. Kevin stated that he was in college when Glenna and Ted divorced, and he did not really have a relationship with Denice.

¶17. Kevin testified that during her life, Grace had three wills. The first will was prepared in the 1990s by Robert Holified—the same Robert Holifield who was a local pastor and provided heirship affidavits for Lampton and the Hunts' property deeds. Kevin stated that he saw Holifield deliver a draft of this will but did not see Grace sign it. The second will contained the same language as the third will (i.e., real property was left to Ted, Trent, and Kevin), but the second will had different subscribing witnesses whose signatures were

7

notarized by a different official. Kevin testified that his coworkers witnessed the second will, and Rachel Sullivan notarized their signatures.

¶18.    According to Kevin, Grace's last will was created in 2007. Kevin stated that this third will was prepared by Ted at the request of Grace, who desired to have her will executed before with subscribing witnesses she knew and trusted. Kevin stated that he was not present at the signing of the third will but said that Grace had discussed its creation and shown him the document after it was signed.

¶19.    Kevin testified that Ted had the original will after Grace moved to Huntsville. Kevin also testified that in 2016, after Grace's death, Ted asked him to contact a Hattiesburg attorney to transfer the property out of Grace's name. According to Kevin, the attorney recommended a quitclaim deed for the property instead of probating the will. Kevin stated that Ted had the original will and sent him a copy of the will via email, but Kevin also admitted that Ted sent him a copy of Grace's second will in the email, not the third will from 2007. Kevin stated that Ted asked him to hold off on filing the quitclaim deed because Ted was considering gifting his portion of the land to Trent and Kevin.

¶20.    Kevin stated that on September 19, 2017, he received a phone call from Anthony Hunt ("Anthony"). According to Kevin's phone records, they had a thirty-minute conversation on that day. Kevin stated that they discussed whether Kevin would be interested in selling Anthony a portion of Kevin's land. Kevin allegedly told Anthony the property "wasn't for sale[.]" The following testimony was elicited:

> Q.    So how did the subject property come up in the conversation?
> A.    He asked me what I – I think he – maybe he thought I owned it. He

8

> asked me what I was going to do with that property and I told him that it didn't belong to me. It belonged to me and my brother and my dad together and we had no plans to sell it or do anything with it.
>
> Q. Did you explain anything to him regarding how it is that it belongs to the three of us?
>
> A. I just told him it had been left to us.

¶21. Kevin stated that he went to pay the property taxes in late January 2018, but he was told that the taxes had already been paid. Kevin stated that he called his father, who merely told him that Lampton had paid the taxes. Kevin subsequently text messaged Lampton, who told Kevin that he had sold the property to the Hunts. Kevin later spoke with Ted about the sale prior to Ted's death in March 2018.

¶22. Kevin stated that he had bought Grace's house and had spent a significant portion of his money renovating the house to accommodate his specific physical needs. He had slowed progress on the renovations, however, due to the litigation. Kevin further stated that the money from Ted's sale of the land was deposited into a bank account payable on death to Denice, allegedly unjustly enriching her when Ted died. Kevin also stated he went through Grace's belongings and disposed of them but never found the original will.

¶23. On cross-examination by Denice's attorney, Kevin was asked about his purchase of Grace's house. Kevin's attorney objected to relevance and a failure to plead a "counter-claim or offset" by Ted's Estate. The chancellor overruled the objection, allowing Kevin to be questioned. The chancellor allowed the deed of trust and deed to be admitted into evidence. The deed of trust evidenced that Kevin bought the house for $140,000, and Kevin testified that he had paid approximately $90,000 on the note. Kevin testified that the money he paid on the note went to Ted for Grace's care in the nursing home, but when she died, Ted told

9

Kevin "to stop sending money."

¶24. An email was produced that showed Ted telling Kevin that he would no longer be paying the water and electric bills for the house due to his income being "drastically reduced." Ted further stated in the email:

> I really need the remaining $17,500 for my share of the house. . . .
>
> . . . .
>
> In addition, I made my wishes known to both you and Trent regarding the final piece of property to be sold. Please send me the contact information for the attorney I sent you money to pay. As you may not have time, I will pursue selling the property and making distribution of the money. This needs to be done ASAP. If I am forced into bankruptcy, the property could easily be lost to all three of us as that would be considered my asset and having signed parts over to you and Trent would be viewed as my trying to prevent creditors from being paid.

Kevin stated that he never paid Ted the money for the house because, according to Kevin, they spoke after the email, and Ted said he did not want him to send the money. Kevin also said that Denice had access to Ted's email and that Ted later called and told him, "We are going to keep Howell business on the phone between the Howells."

¶25. Robert Holifield testified after Kevin. He was the minister who had provided heirship affidavits for both Lampton's and the Hunts' deeds. He stated that he had known Grace and Herbert Howell since 1962, when they were members of his church. Holifield admitted that he drafted a will for Grace after Herbert died but did not know what happened after he delivered it to her—whether she signed it or not. Holifield also admitted that he knowingly signed the heirship affidavit for Lampton, in which he swore Grace did not have a will.

¶26. Denice also testified at trial. She stated that Ted moved back into her house in 2016 after being in poor physical and financial health. Ted was diagnosed with an autoimmune disease, and although he was still able to work, he needed assistance. Denice testified that she would help Ted log in to his work emails and that she would take dictation from him. Denice stated that she helped Ted with any of his personal issues if he asked for her help. Ted eventually fell and broke his ankle, so Denice hired a helper to assist him daily with physical needs. Denice stated that Ted was "upside down on his mortgage, upside down on his car payments[,]" had $10,000 stolen from his account by a woman who was living with him before moving back in with Denice, and "had between 75 and $80,000 in credit card debt."

¶27. Denice admitted that during this time, Ted named her as his 401(k) beneficiary and made a new will naming her as his primary beneficiary. She also testified that she helped Ted apply for "disability insurance benefits" that were deposited into an "Avidian Credit Union" account, of which she was named the "pay-on-death" beneficiary.

¶28. Approximately nine days after Denice became a beneficiary of the Avidian account, she reached out to Lampton about selling Grace's property. Denice stated that Ted received a postcard offering $20,000 for the property, which prompted Ted to ask Denice to call Lampton to see if he knew how much the property was worth. Denice stated that Lampton and Ted talked on the phone, and then Denice and Lampton "began a text message exchange discussing the property." Denice stated that Lampton told her the property was worth at least $60,000 but that Lampton could not afford to buy it at fair market value at that time.

¶29. Lampton and Denice's text messages were admitted into evidence. The conversations evidence a discussion between Denice and Lampton—first about price; they eventually agreed that Lampton would pay $40,000 for the property and cover closing costs, including a survey, court costs, and title work. Denice frequently updated Lampton on her and Ted's health and discussed the logistics surrounding the sale, such as mailing and receiving the deeds. On September 4, 2017, the following text messages were sent regarding the price:

[Denice:] Steve, Ted says that is agreeable to him. Should I tell his lawyer to take the land out of his will? Not certain what time frame you are looking at. Thanks.

[Lampton:] It will take me a few weeks to have survey and title work done. I will get on it tomorrow. Tell him I am Very appreciative of the opportunity to be able to hand pick new neighbors. I would think the will should be amended."

¶30. Denice testified that she wanted Ted to keep the money from the sale for his care. Additional text messages contained the following discussion:

[Denice:] Ted started telling me he wasn't going to tell Trent and Kevin until he sent them their share. I told him he needs the money for his care and if he splits with them, he can move to MS or GA. I guess that was really ugly of me but they are not dealing with his situation at all...

[Lampton:] I understand. You are in a tough situation[.]

[Denice:] Thanks. I truly believe that if they cared more effort would be put into keeping in touch with him.

¶31. Denice stated that the deed was mailed from Mississippi to her house in Huntsville, at which point she arranged for someone to bring the deed to Ted, who was in a nursing home, for him to sign and have it notarized. Then she also had the deed mailed back to Mississippi. Denice later arranged for the check to be brought to Ted, signed, and deposited in the Avidian account.

¶32.   Additional text messages between Denice and Lampton evidenced a discussion over whether Ted and Kevin should be told about the sale.  On February 15, 2016, Lampton sent Denice a message:

> I hope ya'll can get this worked out while Ted feels well enough to deal with it.  I hope you don't mind me saying that I strongly encourage you to insist that Ted personally talk with both boys and get this settle[d] before his health deteriorates again.  This does not need to drag out for months or years to come. Thank you.

Denice responded with:

> I will encourage him to talk to them.  It goes against my better judgement because they have done nothing but take advantage of him over the years.  If you divide the $ three ways and then subtract $ Kevin still owes Ted, It should only be around $92000.  They will definitely need to know how much Ted sold the land for if he talks to them. Thanks.

Denice stated that Kevin owed Ted money because Kevin bought Grace's house.

¶33.   Later, after Ted's death, text messages between Lampton and Denice evidence the following discussion on October 24, 2018:

| [Denice:] | Received paperwork today where Kevin and Trent are filing suit over the property.  Not surprised but not certain what they expect.  The estate doesn't have enough money to pay all of Ted's bills. |
| --- | --- |
| [Lampton:] | That is exactly why I asked that y'all tell the boys about the sell [sic] of the property.  I don't know what is going to happen but it was my understanding that Ted was the sole owner and sold the land to me in good faith. |
| [Denice:] | Actually, you said that you thought it best NOT to tell them. Ted sold it with the understanding that he had the right to do so. The boys (Kevin) never paid Ted his portion of what he owned him on the house or $7000 in student loans Ted paid on his behalf.  Ted had asked Kevin for that money and Kevin refused to pay it. |

Denice testified that after that text, Lampton called her and said, "If you recall, what I said

13

was please don't tell the boys how much I paid for the land. [Denice] said, Yes. Now that you've said that I do recall."

¶34. Denice stated that after Ted moved back in with her in 2016, she did a "page-by-page, file-by-file search" of Ted's work papers but did not find Grace's will. She also stated, however, that she overheard a phone conversation between Kevin and Ted during which Kevin stated, "I have her original will." Denice also admitted that in her role as the administrator of Ted's Estate, she never pursued a claim against Kevin for the money owed on the deed of trust, and the email asking Kevin for the money was dictated to her by Ted.

¶35. Anthony, the neighbor who bought the land from Lampton after he had purchased it from Ted, testified after Denice. He stated that he had no knowledge of Grace's will and that Lampton had told him Ted was her only heir. Hunt testified that he had only spoken with Kevin twice prior to purchasing the property. Their first conversation was in 2015 regarding a different portion of wooded land between his house and Kevin's house, and Anthony asked to buy an acre of this portion from Kevin. Anthony admitted that in 2017 he talked with Kevin again about the same acre of wooded land between their houses. Anthony testified, however, that he never spoke with Kevin about the disputed parcel and that he did not know that Kevin "owned or claimed ownership to any portion of the" disputed parcel.

¶36. Trent testified on the third day of trial. He stated, similar to Kevin, that he grew up spending time on his grandparents' land, and "[a]ny time school was out, we were in Mississippi." Trent testified that he helped his grandfather Herbert build the house that Kevin now owns. He stated that his parents divorced after 36 years of marriage, when he

14

was 26 years old, and due to the divorce, Grace "made arrangements" for the land to be divided among Ted, Trent, and Kevin. Trent stated that "we probably never would have done [the will] at all if my dad would have never got divorced." Trent stated that he saw the will "right after it was done," on his next visit to see Grace, but that he never saw the original will again. Trent testified that he did not know where the original will was and that he never went to the house where Ted and Denice lived to look for Grace's will after Ted died. Trent further stated that "[Lampton] is the one that put [Grace's will] together, he helped her."

¶37. Trent testified that after Grace died, by agreement, the house was opened and "[a]nybody that wanted anything was allowed to get stuff." Trent stated that Ted wanted to avoid probate, so he gave Kevin money to get a lawyer and "draw all of this paperwork up." Trent stated he merely got a call that a FedEx package was in the mail that contained a deed he needed to sign. After Trent signed the quitclaim deed, he testified that Ted called him and said, "I'm thinking that I'm just going to give you and Kevin my share, he said, it's not that much. It is not going to be much inheritance, but I wanted to just go ahead when we do this quitclaim deed, we won't have to do it twice." Trent said he never heard anything else about the deed and never heard Ted say anything about selling the property.

¶38. On cross-examination, Trent stated that he never spoke with the Hunts about Grace's will. He also was asked about the money Kevin owed from his purchase of Grace's house. Trent stated that he had not received any money from that sale and had not asked Kevin for any payment.

¶39. After Trent's testimony, Kevin rested. The Hunts, Lampton, and Denice moved for

15

involuntary dismissals. The chancellor granted an involuntary dismissal for the Hunts based on the theory that they were bona fide purchasers for value without notice. The trial continued as to Lampton, Denice, and Ted's Estate.

¶40. Lampton was then called to testify. He stated that Grace was "like a mother" to him and had granted him a right of first refusal to her property. Lampton stated that he had completely forgotten that he had signed Grace's will until he saw it at his attorney's office. Lampton testified that he had not prepared the will, despite what Trent had testified, but that he had discussions with Grace after the will was executed where she expressed that she was conflicted about not leaving everything to Ted. Lampton stated that he did not remember the will when he was discussing the sale of the property with Denice, but he did remember his conversations with Grace over her conflicted feelings.

¶41. Regarding Holifield's heirship affidavit, Lampton agreed that Holifield told him he had written a will for Grace and that Holifield still had a copy of the will. Lampton's trial testimony conflicted with his deposition testimony that Holifield told him Grace had signed the will. At trial, Lampton stated he was incorrect about that, and he said that Holifield never told him Grace had signed the will.

¶42. The trial ended after Lampton's testimony. The chancellor asked for all parties to submit findings of facts and conclusions of law.

### III.   Litigation Continues to Final Judgments

¶43. On June 30, 2021, Lampton filed a motion in the will case to supplement his "Notice of Claim" that was filed on February 11, 2019. Lampton directly challenged the validity of

16

the copy of the will and argued, for the first time, that the court should apply a presumption of revocation because the original will could not be found. Lampton relied on testimony from the May 2021 trial in the property case. Kevin filed a motion to strike, arguing that the statute of limitations had expired and that Lampton had failed to timely assert the will-contest claim.

¶44. On October 12, 2022, the chancellor denied Kevin's motion to strike. The chancellor's reasoning was given on the record at the hearing on the motion to strike on September 29, 2022. The chancellor reasoned that the notice of claim stated that Lampton was "contesting the matter," and the "matter" was the will; so Lampton sufficiently put Kevin on notice that he was challenging the will.

¶45. On December 8, 2022, a bench trial was held in the will case. Testimony and other evidence from the trial in the property case was "adopted" into the record of the will case for the chancellor's consideration in his ruling. Otherwise, Kevin was the only witness who provided additional testimony.

¶46. On February 9, 2024, the chancery court entered a Rule 54(b) final judgment in the will case, and the same judgment was entered in the property case on February 16, 2024.[7] The chancellor upheld the copy of Grace's will as valid. The chancellor found that Ted and

---

[7] The judgment is styled as only pertaining to the will contest case; however, the final judgment states that the case "came on for hearing after the Consolidation of the Estate of Grace Howell, the Estate of Ted Lavon Howell and the underlying case of the Estate of Grace Howell, Kevin Howell and Trent Howell verses the Estate of Ted Howell, Steve Lampton, Anthony G. Hunt and Brandy L. Hunt and Deni[c]e Howell[.]" Further, this Court notes that in both the will case's trial transcript and the post-trial hearing transcript, the chancellor made clear that the judgment was for both cases. The parties do not dispute that a final, appealable judgment was appealed from in both cases.

Lampton "should have been on notice that certain matters should have been disclosed" to their closing attorneys due to the fact that no estate for Grace had been opened and the deeds/heirship affidavits stated how Ted had received his interest in the property.

¶47. Nevertheless, the chancellor upheld his prior ruling that the Hunts were good faith purchasers for value. The chancellor reasoned that since the will was valid, the only remedy was to award Kevin and Trent "a judgment for 2/3rd's the value" of the property that was improperly sold by Ted, which was calculated as $43,800. The chancellor then subtracted $17,500 from the two-thirds value, setting off the damages by the value allegedly owed by Kevin to Ted for the purchase of Grace's house. Kevin and Trent were awarded a judgment of $26,300 with interest against Lampton and Ted's Estate, jointly and severally. Further, damages were awarded against Denice and Ted's Estate, jointly and severally, "in the amount of $50,000 in actual damages [as] well as $20,000 in attorney fees."

IV.    *Post-trial Proceedings and Appellate Proceedings*

¶48. Kevin filed post-trial motions in both the will and the property cases. A hearing on the motions was held on June 6, 2024. The chancellor denied Kevin's post-trial motion in the will case on August 7, 2024, and in the property case the chancellor corrected the damages awarded in that case's final judgment. The August 13, 2024, order stated:

> The Court calculates the Plaintiff's two-thirds interest as $43,733.34. As recited in the Final Judgment the Court finds that the damages should be further reduced by $17,500, for a total damages of $26,233.34. This award shall be joint and several against Denice Stisher-Howell, The Estate of Ted Howell, and Steve Lampton.

The chancellor also clarified the final judgment's award of $50,000 as compensatory

18

damages, and the $20,000 for attorney's fees were awarded "in lieu of punitive damages."

Otherwise, the motion to amend was denied.

¶49.    The case records were still separated, and no order for consolidation was entered in the chancery court records.  In the will case, Lampton filed a notice of appeal on August 22, 2024, and Kevin filed a notice of cross-appeal on September 4, 2024.  In the property case, only Kevin filed a notice of appeal on September 12, 2024.

¶50.    On February 4, 2025, Lampton filed a motion in the Supreme Court requesting consolidation of the two cases.  Kevin opposed the motion.  The supreme court granted the motion in part by ordering that the appellate records "be administratively consolidated" but that "briefing in each appeal should proceed separately."[8]

¶51.    On May 23, 2025, prior to assignment of these appeals to our Court, Kevin filed a motion on appeal in only the will case entitled "Motion to Docket and Dismiss Appeal." Kevin argued that because the cases were not "fully" consolidated, Lampton does not have standing to appeal the will case because of his failure to file a notice of appeal in the property case.  Kevin stated that "[h]aving failed to file an appeal of the adverse decision in 2024-CA-01046, *Lamar County Chancery Cause No. 18-cv-342* (the 'property case'), Lampton no longer has standing to appeal in this Estate matter."  Kevin contended that the motion to consolidate the appeals, which was filed by Lampton and granted in part for administrative consolidation, was Lampton's "after-the-fact attempt to recover" from the failure to file a notice of appeal in the property case.  The supreme court assigned the case to this Court and

---

[8] This Court entered an order on March 25, 2026, consolidating the two cases for the purpose of the appeals.

19

ordered that "the motion should be passed for consideration with the merits of the appeal." This Court entered an order consolidating the appeals on March 25, 2026, and we deny the motion to dismiss. *See infra* ¶¶99-102.

## ISSUES PRESENTED

¶52.　In the will case, Lampton asserted as an issue on appeal:

> I.　Whether the chancellor erred by finding that all factors establishing the presumption of revocation were satisfied but, ultimately, whether the will proponent successfully rebutted this presumption by clear and convincing evidence.

Kevin cross-appealed in the will case and raised the following issues:

> II.　Whether the chancellor erred by finding that the two-year statute of limitations did not bar Lampton's claim.
>
> III.　Whether Lampton waived his grounds for appeal by failing to file a post-trial motion.

Kevin appealed in the property case, and in his brief, he raised the following issues:

> IV.　Whether the chancellor erred by granting the Hunts' motion for involuntary dismissal.
>
> V.　Alternatively, whether the chancellor erred in his award of damages.

Lastly, this Court will address Kevin's motion that challenges:

> VI.　Whether the appeal is moot and whether Lampton has standing.

## ANALYSIS

> **I.　Whether the chancellor erred by finding that all factors establishing the presumption of revocation were satisfied but, ultimately, whether the will proponent successfully rebutted this presumption by clear and convincing evidence.**

¶53.　This issue was the only one Lampton raised in his appeal. Lampton argued that all

20

factors establishing the presumption of revocation were met and that "the trial court erred in its application of the presumption of revocation" and in finding that Grace's will was valid.

### A. Presumption of Revocation

¶54. "[W]hen a will cannot be found following the death of a testator and it can be shown that the testator was the last person in possession of the will, there arises a rebuttable presumption of revocation." *In re Est. of Mitchell*, 623 So. 2d 274, 275 (Miss. 1993). "Our Court does not lightly credit claims [that] a man has revoked his will, by destruction or otherwise." *In re Est. of Leggett*, 584 So. 2d 400, 402 (Miss. 1991).

### i. Will Contest

¶55. The admission of Grace's will to probate created a prima facie case that the will was valid. Mississippi Code Annotated section 91-7-27 (Rev. 2021) states: "[o]n the trial of an issue made up to determine the validity of a will which has been duly admitted to probate, such probate shall be prima facie evidence of the validity of the will." *See also Bearden v. Gibson*, 215 Miss. 218, 60 So. 2d 655, 656 (1952); *Perry v. Aldrich*, 251 Miss. 429, 436, 169 So. 2d 786, 789 (1964); *Stover v. Davis*, 268 So. 3d 559, 563 (¶11) (Miss. 2019) ("The proponent makes a *prima facie* case of validity when the will and record of probate are admitted into evidence." (citing *Harris v. Sellers*, 446 So. 2d 1012, 1014 (Miss. 1984))).

¶56. Mississippi caselaw explains, though, that the "probate of a will in common form is not a final adjudication of the validity of the will but is an 'incipient step' necessary to enable the court to proceed to carry the will into execution." *Perry*, 169 So. 2d at 789. Thus, the burden of proof remained on Kevin throughout the contest of the will. *Harris*, 446 So. 2d

21

at 1014; *Warren v. Sidney's Est.*, 183 Miss. 669, 184 So. 806, 807 (1938) ("The burden of proof as to the validity of a will is on the proponents thereof throughout the contest of the same." (citing *Brown v. Walker*, 11 So. 724 (Miss. 1892))). However, Lampton had the "burden of going forward with proof" to "overcome the prima facie case" and prove his claim of invalidity of the copy of the will. *Harris*, 446 So. 2d at 1014.

*ii.      Elements of the Presumption of Revocation*

¶57.    The Supreme Court has addressed the elements necessary for when the presumption of revocation arises. *Est. of Leggett*, 584 So. 2d at 403. The evidence must show "(a) the would-be testator made a will, (b) last known to have been in its maker's possession prior to his death, but (c) not found after death despite diligent search." *Id.*

*a.      Whether Grace made a will.*

¶58.    Kevin and Trent both testified that they saw Grace's will after it was prepared and discussed its contents with her. Lampton testified that Grace had expressed concern over the terms of her will because she allegedly felt that Ted, her only son, should receive everything. A copy of the 2007 will was found and admitted to probate. An affidavit from Glenna, a subscribing witness, is in the record. Glenna swears to the formation and testamentary capacity of Grace on the day the will was executed. Further, the chancellor found that "[a]t the time of her death she[, meaning Grace,] had executed a Last Will and Testament."

*b.      Whether Grace's will was last known to have been in her possession prior to her death.*

¶59.    Lampton, Kevin, and Trent all testified that the last time they saw the original was in Grace's house. Trent testified that he was "pretty sure" Ted had the original, but he could

not say for certain. Kevin stated that Ted had the original in Huntsville.

¶60. Testimony from Kevin and Denice supported that Grace's personal belongings moved with her to Huntsville, where she lived with Ted and Denice for a period of time before moving to a nursing care facility. Denice testified that after Grace moved to the nursing care facility, all of Grace's belongings were no longer at her house except for a box of clothes in her attic. Kevin stated that Grace's belongings would have been in Ted's possession, including the original will.

¶61. Testimony from Denice and Trent evidenced that Ted moved many times after Grace's death and before moving back in with Denice. Denice testified that she had never seen Grace's original will, but she had overheard a conversation between Kevin and Ted where Kevin stated that Kevin had the original.

¶62. Kevin further testified that Ted sent him a copy of the original will after Grace's death when they were creating the quitclaim deed. Kevin, however, also acknowledged that the emails admitted into evidence proved that Ted had sent him a copy of the second will via email. There was conflicting evidence as to her possession, but the chancellor found that "it is beyond reason that [Ted] would either not have had the original will or kn[own] of its existence. The execution of the [quitclaim] deed from him to he and his son's [sic] confirms this."

>            c.    *Whether Grace's will was not found after her*
>                  *death despite diligent search.*

¶63. A copy of the 2007 will was admitted to probate. Kevin testified that since April 2007, he had not tried to locate the will. However, upon further questioning, Kevin testified that

in 2010 he had "completely cleaned out" his grandmother's house "of all her possession[s,] and the will was not in any of those possession[s.]" Denice testified that she had searched through Ted's belongings and papers but never found Grace's original will. Trent testified that he never looked for Grace's original will because he thought Ted had the will. Further, Trent stated that he would not have felt comfortable going to Denice's house to search in Ted's belongings for Grace's will.

¶64.    Having set out the evidence of the three elements, *see Est. of Leggett*, 584 So. 2d at 403, our appellate review is limited on this issue such that we "must affirm a chancellor on a question of fact unless upon review of the record we [are] left with the firm and definite view that a mistake has been made." *Taylor v. Tolbert*, 342 So. 3d 1204, 1208 (¶21) (Miss. Ct. App. 2022) (quoting *In re Est. of Tallant*, 644 So. 2d 1189, 1194 (Miss. 1994)). "We must 'examine the entire record and accept that evidence which supports or reasonably tends to support the findings of fact made below, together with all reasonable inferences which may be drawn therefrom and which favor the lower court's findings of fact.'" *Est. of Cromwell v. Est. of Trotter*, 151 So. 3d 194, 198 (¶19) (Miss. 2014) (quoting *Mullins v. Ratcliff*, 515 So. 2d 1183, 1189 (Miss. 1987)). "This Court will not disturb a chancellor's findings of fact unless they are manifestly wrong, clearly erroneous, or not supported by substantial credible evidence." *In re Est. of Holmes*, 961 So. 2d 674, 679 (¶11) (Miss. 2007) (citing *Williams v. Williams*, 843 So. 2d 720, 722 (¶10) (Miss. 2003)). "A chancellor's interpretation and application of the law, however, is reviewed de novo." *Est. of Rutland v. Rutland*, 24 So. 3d 347, 351 (¶9) (Miss. Ct. App. 2009) (citing *Tucker v. Prisock*, 791 So. 2d

190, 192 (¶10) (Miss. 2001)).

¶65.    The evidence as to whether all the factors were met to support a presumption of revocation was conflicting and was indeed for the finder of fact to make the factual determination.  Again, "[w]here there is conflicting, credible evidence, we defer to the findings below.  Findings of fact made in the context of conflicting, credible evidence may not be disturbed unless [the appellate court] can say that from the evidence that such findings are manifestly wrong, given the weight of the evidence."  *Poole v. City of Pearl*, 908 So. 2d 728, 732 (¶12) (Miss. 2005) (quoting *In re Extension of Boundaries of City of Winona*, 879 So. 2d 966, 971 (¶4) (Miss. 2004)).  "Moreover, 'if the judgment of the court can be sustained *for any reason*, it must be affirmed, and even though the trial judge based it upon the wrong legal reason.'"  *The Pennington Grp. LLC v. PriorityOne Bank*, 228 So. 3d 880, 886 (¶16) (Miss. Ct. App. 2017) (quoting *Reed v. Weathers Refrigeration & Air Conditioning Inc.*, 759 So. 2d 521, 526 (¶17) (Miss. Ct. App. 2000)).

¶66.    The chancellor found:

> At the time of her death she[, meaning Grace,] had executed a Last Will and Testament, however, the same was not filed of record until September 19th, 2018 when a true and correct copy of the Last Will and Testament was presented and accepted by the Court as the Last Will and Testament of Grace J. Howell.

> Pursuant to Mississippi case law there is a presumption that revocation exists if the original will cannot be found.  This presumption may be overcome by clear and convincing evidence that the maker did not intend to revoke the will.

It is clear from the chancellor's order that he found the elements to support the presumption of revocation were satisfied.  Under the facts and evidence, as presented at trial as stated

25

above, this Court concludes that the chancellor did not manifestly err by applying the presumption of revocation.

## B.    Rebuttal of Presumption of Revocation

¶67.    The proponent of the will may rebut the presumption of revocation by presenting "'clear and convincing evidence' that the maker did not intend to revoke her will." *Taylor*, 342 So. 3d at 1209 (¶24).[9] The presumption of revocation "is not overcome merely 'by proof that persons injuriously affected by the will had opportunities to destroy it.'" *Id.* (quoting *James v. Barber*, 244 Miss. 234, 142 So. 2d 21, 27 (1962); *Est. of Willis*, 207 So. 2d 348, 349 (Miss. 1968)).

¶68.    After noting that the presumption of revocation exists, the chancellor found that at the time of Grace's death "her sole heir at law was her son Ted Lavon Howell. Therefore in the event that the Last Will and Testament is found to have been revoked then Ted Lavon Howell would be entitled to her entire estate pursuant to the intestate provisions of Mississippi Law." The chancellor noted that Lampton "was a witness to the Last Will and Testament Of Grace," but Lampton testified that "he did not know the contents of the will and Grace Howell later had told him that she was conflicted as to who to give the land to but felt her son should have it." The chancellor nevertheless found that "[n]o testimony was

---

[9] Kevin argued that under *Estate of Dowdy*, 818 So. 2d 1255, 1258 (¶11) (Miss. Ct. App. 2002), he only needed to present slight evidence to overcome the presumption of revocation because it was shown that the "contestant[] of the will, [Ted,] had access" to the will. This Court clarified the *Dowdy* holding in *Taylor*, 342 So. 3d at 1210 n.2, by stating that *Dowdy* relied on a supreme court case that applied the clear and convincing standard; thus, we apply the "clear and convincing evidence standard" to the determination of whether the will proponent rebutted the revocation presumption. Kevin's argument is rejected, and we will follow the supreme court precedent as we noted in *Taylor*.

received showing [Grace] changed her will or revoked the same." The chancellor found that

> Lampton sold the property to the Hunts in November, 2017. A title opinion was obtained and Heirship Affidavits were obtained as to the heirs of Grace Howell. Ted was listed as the sole heir, however, the affidavits further states that the decedent did not leave a will. Since Steve Lampton was the seller and also a witness to the will Lampton should have at the least notified the attorney closing the sale that he had witnessed a will of Grace Howell. Based on Steve Lampton's affidavit together with other documents the Court is satisfied that Grace Howell never revoked or issued a new will. . . . Therefore this Court finds that the Last Will and Testament of Grace Howell is a valid and duly probated will.

After finding that the will was valid, the chancellor then addressed Ted's knowledge of the will. The chancellor found that

> pursuant to said will Ted as a devisee under her will, and having previously executed a deed on part of the property and in which he claimed the heirs at law were he, Trent and Kevin, [Ted] should have at the least notified the attorney that he knew of the existence of a will and that even though he did not know if one still existed that an inquiry could be made to determine if one still existed.

Because of the language in the quitclaim deed, the chancellor found that "it is beyond reason that [Ted] would either not have had the original will or kn[own] of its existence[,]" and that "[t]he execution of the deed from him to he and his son's confirms this." The chancellor reasoned that "[e]ven though Ted died after the execution of the Deed[]s his actions indicate his knowledge of the will. His actions indicated fraud on his behalf." The chancellor then determined that Denice "directly benefitted from the fraud committed by" Ted.

¶69.  After sixteen paragraphs of factual discussion, the chancellor concluded that "[h]aving considered the entirety of the testimony and documents presented as well as the briefs of the parties the Court is satisfied that the plaintiffs have overcome the presumption of the

27

[in]validity of the will."[10]  The chancellor then awarded damages to Kevin.

¶70.    The chancellor, sitting in a bench trial, is the sole authority of witness credibility and factual determinations when facts are in conflict.  *Est. of Crowell v. Est. of Trotter*, 151 So. 3d 194, 198-99 (¶19) (Miss. 2014) (quoting *Mullins*, 515 So. 2d at 1189); *Poole*, 908 So. 2d at 732 (¶12) (quoting *In re Extension of Boundaries of City of Winona*, 879 So. 2d at 971 (¶4)).  Under our deferential standard of review, and in light of the fact that the chancellor is responsible for resolving factual conflicts, this Court affirms the chancellor's decision to uphold the validity of the will.  There is substantial evidence to support the chancellor's determination that Kevin successfully rebutted the presumption of revocation.

## II.    Whether the chancellor erred by finding that the two-year statute of limitations did not bar Lampton's claim.

¶71.    Kevin asserted on cross-appeal that the chancellor erred when he denied Kevin's motion to strike Lampton's supplemental motion asserting a new argument for the will contest because it was filed outside the two-year statute of limitations in Mississippi Code Annotated section 91-7-23 (Rev. 2021). In the supplemental motion, Lampton directly challenged the validity of the probated will and raised a new argument for the presumption of revocation.  Kevin filed a motion to strike the supplemental motion, arguing that Lampton's supplement was time-barred by the two-year statute of limitations. Kevin argued

---

[10] Although Lampton argues the chancellor incorrectly applied a "presumption of validity of the will," this Court finds that the chancellor clearly intended the only plausible legal conclusion based on the pleadings and arguments before the court at the time.  That is that Kevin had overcome the presumption of revocation.  While the chancellor incorrectly referred to the presumption of revocation as a presumption of invalidity, it is clear he was referring to the correct law and applied the correct burden of proof, i.e., clear and convincing evidence.

that Lampton should not be allowed to challenge the validity of the copy of the will as "incomplete, inaccurate or not authentic" because Lampton had failed to raise that objection in the notice of claim, which was Lampton's original pleading. Kevin further argued that "[n]ot only was Lampton statutorily obligated to bring any challenge within two years, but as a matter of equitable estoppel, he was obligated to bring it before the trial had occurred in the property case.

¶72. The chancellor denied Kevin's motion to strike. The chancellor reasoned that Lampton's original filing on February 11, 2019, was within the two-year limitations period, and stated that the party was "contesting the matter" and that the "matter" was the will; so Lampton sufficiently put Kevin on notice that he was challenging the will. We review the chancellor's decision to deny the motion to strike for abuse of discretion. *Burnett ex rel. Islam v. Burnett*, 792 So. 2d 1016, 1019 (¶6) (Miss. Ct. App. 2001) (quoting *McNeil v. Hester*, 753 So. 2d 1057, 1063 (¶21) (Miss. 2000)); *Gilmer v. McRae*, 355 So. 3d 219, 227 (¶24) (Miss. 2022) ("This Court reviews a trial court's denial of a motion to amend a pleading for an abuse of discretion." (citing *Holcomb, Dunbar, Watts, Best, Masters & Golmon, P.A. v. 400 S. Lamar Oxford Mad Hatter Partners LLC*, 335 So. 3d 568, 572 (¶8) (Miss. 2022))).

¶73. Mississippi Code Annotated section 91-7-23 provides:

> Any person interested may, at **any time within two years, by petition** or bill, **contest the validity of the will probated** without notice; and an issue shall be made upon and tried as other issues to determine whether the writing produced be the will of the testator or not. If some person does not appear within two years to contest the will, the probate shall be final and forever binding, saving to infants and persons of unsound mind the period of two years to contest the

29

will after the removal of their respective disabilities. In case of concealed fraud, the limitation shall commence to run at, and not before, the time when such fraud shall be, or with reasonable diligence might have been, first known or discovered.

(Emphasis added). The Supreme Court has held that "the word 'probate' within the statute refers to the act of the clerk accepting the will for probate[.]" *In re Will of Fields*, 570 So. 2d 1202, 1203 (Miss. 1990) (citing *In Re Est. of Davis*, 510 So. 2d 798, 800 (Miss. 1987)).

¶74. It is undisputed that Lampton's original filing was timely but that his supplement was filed after the two-year statute of limitations. Grace's Estate was opened on September 20, 2018, by an "Order Admitting Will to Probate in Common Form." On February 11, 2019, Lampton filed his notice of claim, which was actually a motion to set aside the petition to probate the will. On Monday, September 21, 2020, the two-year statute of limitations for filing a notice of claim expired. On June 30, 2021, Lampton filed his supplement to his motion to set aside the will. Again, it is undisputed that Lampton's original filing was timely but that his supplement was filed well outside the two-year statute of limitations.

¶75. The issue is whether Lampton's supplement to his original filing related back to his original pleading such that this Court can consider his legal argument. Mississippi Rule of Civil Procedure 15(c)(1) provides that an amendment to a pleading relates back to the date of the original pleading if it "arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading[.]"

¶76. "[T]he standard for determining whether amendments qualify under Rule 15(c) is not simply an identity of transaction test; although not expressly mentioned in the rule, the courts also inquire into whether the opposing party has been put on notice regarding the claim or

defense raised by the amended pleading." *Parker v. Miss. Game & Fish Comm'n*, 555 So. 2d 725, 731 (Miss. 1989) (internal quotation marks omitted) (quoting Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure (Civil) § 1497, at 495 (1971)). Lampton's original notice of claim stated, "[t]wo grandchildren of Grace J. Howell, Trent Howell and Kevin Howell have filed a copy of Grace Howell's will dated March 7, 2007 and now claim that the copy of the will is a valid document for probate." The pleading ended with a statement that the motion was "notifying all parties that are involved in the property once owned by Grace Howell that this matter is hereby contested."

¶77. Lampton's supplement stated that "testimony ha[d] been obtained" in the property case "that shows that no one has the original Will from Grace J. Howell, and no one has seen the original Will since it was in Grace Howell's possession in 2007." Lampton then submitted that a presumption of revocation arose because the will could not be found and argued that "the proponents of the Will have not met their duty to provide clear and convincing evidence that the Will was not destroyed by Grace Howell with intent to revoke it." The supplement challenged the validity of the copy of Grace's will, which was clearly a fact that was set forth in the original notice of claim.

¶78. The chancellor reasoned that Lampton's original filing stated that he was "contesting the matter" and that the "matter" was the will, so Lampton sufficiently put Kevin on notice that he was challenging the will. The chancellor stated that Lampton's original filing was a timely "motion to set aside the will and then the last paragraph says that it is contested," so under a "notice pleadings" standard, the chancellor found that "the matter has been

31

raised." There is little doubt the supplement allegations "arose out of the conduct, transaction or occurrence set forth" in Lampton's initial challenge to the validity of the will. This Court finds that the chancellor did not abuse his discretion by denying the motion to strike and allowing Lampton's will contest to proceed.

### III. Whether Lampton waived his grounds for appeal by failing to file a post-trial motion.

¶79. Kevin also argued on cross-appeal that Lampton waived his ability to file an appeal of the chancellor's ruling on the validity of the will by failing to file a post-trial motion. Kevin's argument is incorrect.

¶80. Mississippi Rule of Civil Procedure 52(b) states that

> [w]hen findings of fact are made in actions tried by the court without a jury, the question of the sufficiency of the evidence to support the findings may thereafter be raised regardless of whether the party raising the question has made in court an objection to such findings or has filed a motion to amend them or a motion for judgment or a motion for a new trial.

Lampton's appeal in this case challenges the chancellor's ruling after the bench trial on the validity of the will by arguing that the evidence was sufficient to meet the factors to support a presumption that the will had been revoked. This Court finds that Rule 52(b) is directly applicable to this scenario. Accordingly, a post-trial motion was not mandatory to perfect an appeal. *Thompson v. Thompson*, 380 So. 3d 945, 957 (¶48) (Miss. Ct. App. 2024) ("Mississippi law plainly provides that '[a] party is not required to file a post-trial motion in chancery court in order to appeal the chancery court's judgment." (quoting *Aspired Custom Homes LLC v. Melton*, 72 So. 3d 540, 544 (¶11) (Miss. Ct. App. 2011); citing M.R.C.P. 52(b))).

¶81. Further, the issues in this appeal are not ones that have been specifically designated as requiring a post-trial motion. As stated in *McLemore v. State*, 669 So. 2d 19, 24 (Miss. 1996),

> there are certain errors that parties must bring to the attention of the trial judge in a motion for a new trial. These include, all new matters, motions made upon the ground of inadequate or excessive damages, motion made for a new trial where it is contended that the verdict is against the overwhelming weight of the evidence, and the denial of a continuance.

(Citing *Jackson v. State*, 423 So. 2d 129 (Miss. 1982)). Lampton does not raise any of those specific issues. This Court finds that Lampton's assignment of error was not procedurally barred.

## IV. Whether the chancellor erred by granting the Hunts' involuntary dismissal.

¶82. Kevin argued on appeal that the chancellor erred by granting the Hunts' motion for an involuntary dismissal in the property trial at the close of Kevin's case. Kevin argued that the transcript "explicitly confirms that the Court improperly placed the burden on the [Kevin] to 'disprove' the [Hunts'] affirmative defense of bona fide purchaser for value without notice." Kevin contended that he bore no burden to disprove the Hunts' affirmative defense.

¶83. It is reiterated that this issue is raised by Kevin in the property case, and this argument is based on alleged error that occurred when the chancellor, sitting as the trier of fact without a jury, granted the Hunts' motion for a "directed verdict" at the close of Kevin's case-in-chief. Mississippi Rule of Civil Procedure 41(b) is clear that a motion for dismissal of an action tried by the court without a jury after the presentation of the plaintiff's evidence is a motion for an involuntary dismissal, not a directed verdict. M.R.C.P. 41(b). A party's

33

motion for involuntary dismissal should be granted if the chancellor, after considering the evidence fairly, would find for the defendant. *Century 21 Deep S. Props. Ltd. v. Corson*, 612 So. 2d 359, 369 (Miss. 1992) (citing *Ainsworth v. Callon Petroleum Co.*, 521 So. 2d 1272, 1274 (Miss. 1987); *Mitchell v. Rawls*, 493 So. 2d 361, 362 (Miss. 1986)). In reviewing the chancellor's grant or denial of a motion for involuntary dismissal, we apply the "substantial evidence/manifest error" standards. *Id.* The chancellor, here, erred by viewing the Hunts' motion as one for a directed verdict and viewing the evidence in the light most favorable to Kevin. However, this Court does not find this error to be reversible and, instead, will apply the correct, more deferential standard to this issue. *Magdi Corp. v. Beruk Const., Inc.*, 433 So. 3d 313, 317 n.6 (Miss. Ct. App. 2026); *see Gulfport-Biloxi Reg'l Airport Auth. v. Montclair Travel Agency Inc.*, 937 So. 2d 1000, 1004 (¶13) (Miss. Ct. App. 2006); *Stewart v. Merchants Nat'l Bank*, 700 So. 2d 255, 259 (Miss. 1997).

¶84. "The law of this state dictates that, generally speaking, one who acquires real property takes it subject to whatever claims lie against it and whatever title defects may exist (i.e., The purchaser steps into the shoes of the seller.)." *Bd. of Educ. of Lamar Cnty. v. Hudson*, 585 So. 2d 683, 687 (Miss. 1991) (citing *Hardy v. Wheaton*, 374 So. 2d 790, 791 (Miss. 1979)). Our law, however, also "seeks to protect bona fide purchasers for value without notice[,]" which is defined as "'one who has in good faith paid a valuable consideration without notice of the adverse rights of another.'" *Simmons v. Miss. Transp. Comm'n*, 717 So. 2d 300, 303 (¶13) (Miss. 1998) (quoting *Giesbrecht v. Smith*, 397 So. 2d 73, 77 (Miss. 1981)).

¶85. In this case, the chancellor found that the Hunts were bona fide purchasers of the

property without notice of Grace's will. On the record, the chancellor explained that the testimony from Hunt supported that he had bought the property from Lampton for $8,000 per acre, for a total of $65,600. An appraisal from 2019 was introduced that estimated the value of the land at $9,000 per acre. The chancellor stated that he "cannot find that . . . the Hunts got or obtained the property at substantially less value than what it could have been worth." Then the chancellor reasoned that the Hunts were not aware of the will "because there was not a will on file" at the chancery court. Addressing the factual discrepancy as to whether Anthony and Kevin discussed the ownership of the property on the phone prior to the purchase so as to put the Hunts on notice of Grace's will, the chancellor's reasoning was stated on the record:

> [N]one of the Howells told Mr. Hunt about any will that may have existed. There may have been a statement that we own it. But a lot of times, people assume that they own something even though there's nothing there to put anybody on notice. The title opinions are clear that they didn't put anybody on notice.

¶86. Kevin argued that the chancellor applied an incorrect legal standard that limited his "inquiry to whether the Hunt defendants had explicit knowledge of the existence of a last will and testament." Kevin contended that while "knowledge of a Will would certainly have defeated the Hunts' claim of being a good faith purchaser, a lack of such knowledge does not, in itself, entitle them to protection." Instead, Kevin submitted that the chancellor should have considered whether the Hunts had "knowledge of circumstances that would put a prudent person acting in good faith on inquiry[.]" *In re Est. of Wheeler*, 958 So. 2d 1266, 1273 (¶26) (Miss. Ct. App. 2007) (citing *Beauchamp v. McLauchlin*, 200 Miss. 83, 25 So.

35

2d 771 (1946)). Kevin contended that the Hunts are charged with notice of the facts that could have been discovered.

¶87. Kevin contended that the Hunts could have asked Kevin how he owned the property or inquired with Lampton as to the details of the property. Kevin further relied on the Hunts' purchase of title insurance in March 2018 as proof that the Hunts lacked good faith. Anthony testified that he did not know about the will and never talked with Kevin about the disputed parcel. Kevin stated that he talked with Anthony about the parcel but never mentioned a will or how he came to own the land. The chancellor heard the factual dispute as to whether Kevin and Anthony talked on the phone. The chancellor also saw proof of text messages between Lampton and Anthony stating that the property was in Grace's name, which "has complicated" the transfer of the property to Lampton. These are, however, factual allegations that the chancellor held under consideration. As we have stated, the chancellor, sitting in a bench trial, is the sole authority of witness credibility and must resolve the factual dispute. *Est. of Crowell*, 151 So. 3d at 198-99 (¶19) (quoting *Mullins*, 515 So. 2d at 1189). This Court finds that the chancellor's grant of involuntary dismissal was supported by substantial evidence. *Id.*

### V. Whether the chancellor erred in his award of damages.

¶88. The chancellor awarded damages to Kevin, Trent, and the Estate of Grace. The chancellor found that the land was sold for $65,600, and two-thirds of that represented Kevin and Trent's interest at a value of $43,733.34. The chancellor stated that "the damages should be further reduced by $17,500, for a total damages of $26,233.34." This was based on the

36

chancellor's determination that "Ted's 1/3rd interest in the home property [that Kevin bought from Grace before her death] was worth $17,500.00. Equity requires interest in the property be transferred to Trent and Kevin." The chancellor applied that $17,500 as a reduction to the damages owed **jointly and severally** by Lampton, Denice, and Ted's Estate. The chancellor also awarded $50,000 in compensatory damages and $20,000 in attorney's fees against Denice and Ted's Estate, jointly and severally.

¶89. Kevin argued that the chancellor "improperly [set-off] damages based upon a claim against Kevin" that was not pled. Kevin references the chancellor's determination that the amount of damages owed to Ted's Estate would be reduced by the amount Kevin allegedly owed for the purchase of Grace's home.

¶90. Kevin testified on cross-examination at trial that he had bought the house while Grace was still alive for $140,000 and paid approximately $90,000 on the note. Kevin further testified that the money he paid on the note went to Ted to be used for Grace's care in the nursing home. When Grace died Ted allegedly told Kevin "to stop sending money." An email from Ted to Kevin was introduced where Ted stated, "I really need the remaining $17,500 for my share of the house." Kevin accused Denice of drafting that email to request the money, and Denice admitted in her testimony that she had drafted the email at Ted's request. Denice also admitted that she, as executor of Ted's Estate, had not sought payment from Kevin. Trent testified that he had never sought payment from Kevin for the money.

¶91. Lampton argued that the chancery court, "as a court of equity, was within its authority to fashion an equitable remedy." Lampton argued that the deed of trust and the deed were

37

admitted into evidence, in addition to the sworn testimony of Kevin, which is substantial credible evidence that supports the chancellor's set-off of the damages against Kevin "due to Kevin's failure to pay for the property deeded to him[.]" Lampton relied on *Jones County School District v. Covington County School District*, 352 So. 3d 1123, 1132 (¶29) (Miss. 2022), for its statement that "chancellors have long been vested with discretionary authority to decide matters of equity." *Id.* (internal quotation marks omitted) (quoting *Flowers v. Est. of Flowers (In re Est. of Flowers)*, 264 So. 3d 775, 779 (¶16) (Miss. 2019)).

¶92. "The question that we must answer when reviewing a chancellor's damage award is not merely whether we would have awarded more or less damages; rather, our inquiry on appeal is whether there is substantial evidence to support the chancellor's findings." *110 South Street LLC v. Atrium Gentlemans Club Inc.*, 217 So. 3d 794, 799-800 (¶24) (Miss. Ct. App. 2017) (quoting *Indus. & Merch. Contractors of Memphis Inc. v. Tim Mote Plumbing LLC*, 962 So. 2d 632, 636 (¶10) (Miss. Ct. App. 2007)). "We have held that '[d]amage awards are only overturned when the trial judge has abused his discretion or in exceptional cases where such awards are so gross as to be contrary to right reason.'" *Lane v. Lampkin*, 234 So. 3d 338, 346 (¶14) (Miss. 2017) (quoting *Lane v. Lampkin*, 175 So. 3d 1222, 1227 (¶7) (Miss. 2015)).

¶93. A set-off, in the context of this case, is "a counterdemand which a defendant holds against a plaintiff, arising out of a transaction extrinsic of the plaintiff's cause of action." 80 C.J.S. *Set-off and Counterclaim* § 5 (updated April 2026). Set-off is an affirmative defense. *See Lovett v. Anderson*, 573 So. 2d 758, 760 (Miss. 1990). The law is clear; affirmative

defenses must be pled and timely pursued, or they are waived. *See Radco Fishing & Rental Tools Inc. v. Commercial Res. Inc.*, 407 So. 3d 167, 178-81 (¶¶20-33) (Miss. 2025); *Pruitt ex rel. Brooks v. Sargent*, 349 So. 3d 729, 731 (¶5) (Miss. 2022) (quoting *Hutzel v. City of Jackson*, 33 So. 3d 1116, 1119 (Miss. 2010)).

¶94. Lampton, Denice, and Ted's Estate never pled the affirmative defense of set-off in their answers.[11] The parties never argued the affirmative defense of set-off. Denice's attorney attempted to cross-examine Kevin about the money he allegedly owed Grace's Estate. The attorney stated he was challenging Kevin's "credibility and, again, the truthfulness." Kevin's attorney objected and argued that the money owed was irrelevant to Kevin's credibility and that neither Ted, nor his Estate, nor the ancillary estate for Ted had pursued the debt. There was never any mention of set-off. In the end, the chancellor reduced the total damages for Kevin by the $17,500 that Ted allegedly requested in an email. However, none of the parties requested to amend the pleadings during trial to include a counterclaim for set-off for the mortgage. *See* M.R.C.P. 15(b).

¶95. Kevin argued that the chancellor cannot grant relief that does not originate from the pleadings. *Caudill v. Caudill*, 811 So. 2d 407, 409 (¶8) (Miss. Ct. App. 2001) ("If the chancellor is not able to determine a request for relief from the pleadings, he may not grant such relief."). "Put otherwise, a claim may not be proceeded upon at trial unless it is pleaded in such a form that the party against whom it is asserted is subject to default if he fails to respond." *Johnson v. Franklin*, 481 So. 2d 812, 816 (Miss. 1985).

---

[11] Lampton also filed amended answers which did not include the affirmative defense of set-off.

¶96. While the chancellor certainly "must have considerable discretion in fashioning [a] remedy to the equities of the case presented[,]" this Court finds that the chancellor reduced the damages for set-off when that claim was not pled. *Jones Cnty. Sch. Dist.*, 352 So. 3d at 1133 (¶29). This Court finds that the chancellor erred by reducing the damages by the amount allegedly owed by Kevin under the deed of trust to Grace because the defense of set-off was not pled.[12] The chancellor's grant of damages is reversed, and the award of damages is restored to $43,733.34.[13]

¶97. Kevin also argued that the chancellor "improperly limited Lampton's damages by making him jointly and severally liable for only a portion of the total" amount of damages. While the chancellor ordered an award of $26,233.34 in damages jointly and severally against Lampton, Denice, and Ted's Estate, he also awarded $50,000 of compensatory damages and $20,000 in attorney's fees against both Denice and Ted's Estate. This award of damages is supported by the chancellor's findings that Ted committed fraud and Denice directly benefited and "contributed to costs incurred by the Estate of Grace Howell and Trent Howell and Kevin Howell."

_____

[12] This Court notes that there was insufficient evidence to uphold the chancellor's determination that Kevin owed $17,500. Kevin testified his father had not asked for the money but, instead, had told him to stop sending the money when Grace died. Trent testified that he had never sought payment from Kevin for his portion of the money. The only evidence supporting the monetary figure was the email that Denice admitted she drafted to request Kevin send Ted $17,500. Further, this Court finds that the chancellor allowed Denice and Lampton a windfall by reducing the damages owed only to Ted's Estate. Lampton and Denice were never owed the $17,500. Even if the set-off was supported by the evidence, it should only have reduced the damages owed by Ted's Estate.

[13] This value is two-thirds of the $65,600 purchase price for the land that was sold contrary to Grace's will.

¶98. Kevin merely takes issue with the fact that the chancellor did not include Lampton as a person in committing fraud. The chancellor is the sole authority of witness credibility. *Est. of Crowel*, 151 So. 3d at 198-99 (¶19) (quoting *Mullins*, 515 So. 2d at 1189). The chancellor is the fact-finder who resolves the factual disputes. *Tice v. Shamrock GMS Corp.*, 735 So. 2d 443, 444 (¶3) (Miss. 1999) (quoting *Murphy v. Murphy*, 631 So. 2d 812, 815 (Miss. 1994)). Further, the award of damages was within the discretion of the chancellor, and we find no abuse of discretion here. *Lane*, 234 So. 3d at 346 (¶14) (quoting *Lampkin*, 175 So. 3d at 1227 (¶7)). Accordingly, we will not reverse the chancellor on this argument.

## VI. Whether the appeal should be dismissed as moot.

¶99. Kevin argued that Lampton no longer has standing in the will case because he failed to file a notice of appeal in the property case. Kevin contended that Lampton was required to file a notice of appeal in the property case to maintain his standing in the will case. Lampton filed a timely notice of appeal in the trial court in the will case and argued on appeal that the chancellor erred by finding the copy of Grace's will to be valid. Lampton did not file a notice of appeal in the property case, and Lampton does not raise any issues of alleged error. Lampton limits his briefing in the property case to merely responding to Kevin's arguments, which obviates a need for a notice of appeal, i.e., a cross-appeal. *See Dunn v. Dunn*, 853 So. 2d 1150, 1153 (¶13) (Miss. 2003) (stating "an appellee should not be required to file a cross-appeal unless he or she is aggrieved by the trial court's judgment").

¶100. "Standing must exist when litigation is commenced and must continue through all subsequent stages of litigation, or the case will become moot." *Jackson Pub. Sch. Dist. v.*

*Jackson Fed. of Teachers & PSRPS*, 372 So. 3d 997, 1000 (¶8) (Miss. 2023) (internal quotation marks omitted) (quoting *Hotboxxx LLC v. City of Gulfport*, 154 So. 3d 21, 28 (¶24) (Miss. 2015)). Mississippi law follows "the traditional articulation of 'adverse impact' to describe when a party can assert standing to bring a suit[.]" *Id.* at 1001 (¶10) (quoting *Butler v. Watson (In re Initiative Measure No. 65)*, 338 So. 3d 599, 605 (¶13) (Miss. 2021)). Adverse impact, in the context of the present case, requires this Court to determine "whether a party plaintiff in an action for legal relief can show in himself a present, existent actionable title or interest, and demonstrate that this right was complete at the time of the institution of the action." *Butler*, 338 So. 3d at 605 (¶13) (quoting *City of Picayune v. S. Reg'l Corp.*, 916 So. 2d 510, 526 (¶40) (Miss. 2005)).

¶101. Lampton was adversely impacted by the rulings in the will case because they had the potential to invalidate his sale to the Hunts or require him to pay damages for the land he bought and sold contrary to the rights of the heirs in the will. Lampton would be adversely impacted in the property case if this Court affirms the rulings in the will case because the validity of Grace's will impacts the authority with which Ted transferred the property to Lampton. The two cases are intertwined.

¶102. The will and property cases remained separate until this Court's March 29, 2026 order substantively consolidating the two cases. This Court finds that Lampton had standing to bring his appeal in the will case. The motion to dismiss the appeal as moot is denied.

**CONCLUSION**

¶103. The decision of the chancellor is affirmed on all issues except his decision to set off

42

the damages by the amount allegedly owed by Kevin under a Deed of Trust with Grace. Accordingly, in the will case, we affirm the final judgment entered on February 9, 2024, and the order denying Kevin's motion to amend it. We also affirm the court's prior order denying Kevin's motion to strike. In the property case, the final judgment entered on February 16, 2024, is affirmed except for the ruling on damages. We reverse the chancellor's award of damages and render judgment in favor of Kevin and Trent in the amount of $43,733.34, which is two-thirds the value of the purchase price of the land that was sold contrary to Grace's will.

¶104. **AS TO APPEAL NO. 2024-CA-00964-COA: ON DIRECT APPEAL: AFFIRMED; ON CROSS-APPEAL: AFFIRMED. AS TO APPEAL NO. 2024-CA-01046-COA: AFFIRMED IN PART; REVERSED AND RENDERED IN PART.**

**CARLTON, P.J., WESTBROOKS, McDONALD, McCARTY, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR. BARNES, C.J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. WILSON, P.J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION.**

43